Filed 8/18/20  In re J.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | C089107 |
| AMADOR COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.M.,<br><br>Defendant and Appellant. | (Super. Ct. No. 14-DP-00504) |

L.M., mother of the minor (mother), appeals from the juvenile court's order terminating her parenting rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  She contends the court erred by finding the beneficial parental

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

relationship exception to adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) We will affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prior Dependency Proceedings*

This minor first came to the attention of the Amador County Department of Social Services (Department) in June 2014 after it was reported mother was drinking and smoking marijuana and neglecting the minor, who was two years old at the time. Mother did not accept voluntary services and refused to drug test but agreed to a safety plan which, among other things, prohibited her from consuming alcohol or being under the influence of drugs.

The following week, mother was arrested after physically assaulting the maternal grandmother in front of the minor, who was taken into protective custody. On July 3, 2014, the Department filed a dependency petition pursuant to section 300, subdivision (b) alleging failure to protect the minor. Mother submitted to jurisdiction and the juvenile court sustained the petition on July 24, 2014. On September 4, 2014, the court declared the minor a dependent of the juvenile court, ordered the minor removed, and ordered reunification services and supervised visitation for mother. Mother made progress in her case plan and, at the 12-month review hearing on June 25, 2015, the court returned the minor to her custody under a plan of family maintenance.

Just two months later, the Department filed a supplemental dependency petition pursuant to section 387 alleging mother was extremely intoxicated when she brought the minor to the Department for a visit with the minor's father, R.M. (father). The court ordered the minor detained and placed him with his former foster family and granted mother supervised visits. The parents submitted on the supplemental petition, the allegations of which the court found true. The court extended mother's reunification services and gave the Department discretion to liberalize mother's visits with the minor.

2

In a report filed in December 2015, the Department recommended the minor be reunited with mother given mother's consistent participation in visits. However, the Department reversed course and instead recommended termination of services shortly thereafter due to mother's positive test for opiates. Following a contested hearing in March 2016, the court returned the minor to mother under a plan of family maintenance.

At a November 2016 hearing, the Department reported mother again tested positive for drugs. The court ordered the Department to randomly drug test mother. At a subsequent hearing the following month, the Department reported mother was testing clean. In February 2017, pursuant to the Department's recommendation, the court terminated dependency jurisdiction and awarded mother full legal and physical custody of the minor, with supervised visitation for father.

### Current Dependency Proceedings

On August 2, 2018, the Department learned about a domestic violence incident at mother's home several weeks earlier between mother and her boyfriend of three years, M.S. Mother confirmed she was drinking alcohol and had smoked marijuana that day. She also told law enforcement officers she might have an undiagnosed bipolar disorder. While mother reported she and M.S. did not have a history of domestic violence, M.S. confirmed there had been domestic violence incidents in the past. Mother was taken into custody and the minor was placed out of the home. The Department recommended the minor remain in out-of-home placement with once weekly supervised visits while mother was incarcerated, and twice weekly supervised visits upon her release.

On August 6, 2018, the Department filed a petition pursuant to section 300, subdivisions (b) and (c). The petition alleged that, while under the influence of alcohol and marijuana, mother engaged in a fight with M.S. in the presence of the minor, who was by then six years old. Mother threw items in the home, striking the maternal grandmother in the head. The minor told law enforcement officers, " 'She's acting up again.' " The petition further alleged the minor was exhibiting behaviors consistent with

3

emotional harm such as being out of control and aggressive at school, requiring that he be restrained by school personnel; hitting himself, knocking his head against a wall, and wrapping a vacuum cord around his neck; sitting on the floor at school in a fetal position for extended periods, urinating and defecating in his pants; and having to be placed into an intensive intervention class designed for emotionally disturbed children. Mother took the minor to a mental health assessment but failed to show up for a scheduled follow-up appointment. It was alleged that the Amador County Mental Health Department made multiple attempts to contact mother but was unsuccessful and the minor was not receiving mental health services.

The court ordered the minor detained, ordered supervised visits for mother consistent with the Department's recommendations, and approved the Department's request for assignment of a court-appointed special advocate (CASA).

In its August 2018 report, the Department reported that mother confirmed she had been living with her boyfriend and the minor at the home of the maternal grandmother with whom mother had a domestic violence history. The Department expressed its concerns that mother had returned to abusing alcohol and continued to engage in domestic violence with the maternal grandmother and M.S. The Department was also concerned that the minor's behavior issues were possibly due to witnessing mother's domestic violence incidents. The Department concluded it would not be safe to return the minor to mother's care and recommended that the court exercise dependency jurisdiction, continue the minor in out-of-home placement, not offer mother reunification services, and set the matter for a section 366.26 hearing.

Both parents submitted to jurisdiction on August 30, 2018. The court sustained the allegations in the petition and, at the parents' request, set the matter for a contested disposition hearing. The court ordered twice-weekly supervised visitation for mother.

4

Mother was present and testified at the contested disposition hearing on September 18, 2018. The court denied reunification services to both parents and set the matter for a section 366.26 hearing.

On November 19, 2018, mother filed a petition pursuant to section 388 requesting the court order reunification services for her. The petition argued mother entered Gospel Mission for substance abuse treatment and, as of November 8, 2018, had 111 days of sobriety. She attached documentation to show all of her drug tests were negative and she had no incident reports, and to show her attendance at various programs. Mother argued the requested change would be in the minor's best interest because the six-year-old minor was "closely bonded with his mother," mother exercised all visits afforded her, visits reportedly went well, mother was "young and is very aware that she has a serious problem with alcohol," and mother "is committed to long term treatment to overcome her addiction so that she can provide a stable home for her son."

The Department opposed mother's section 388 petition arguing it was not in the minor's best interest to provide mother reunification services "for a third time where there is such a high risk of disappointment for the minor," and it would be detrimental to the minor who had already been removed from mother's custody three times. The Department noted that, while mother had shown she was capable of periods of sobriety, she had been unable to stay sober or stay away from the maternal grandmother's home and she continued to expose the minor to her substance abuse and domestic violence. The Department also noted the minor needed a stable home environment and concluded there was insufficient time for mother to participate in reunification services and demonstrate permanent changes.

In its section 366.26 report filed December 13, 2018, the Department recommended that the court continue the section 366.26 hearing for 120 days and reduce mother's visitation from one time per week to twice per month to allow the potential

adoptive family to have additional time with the minor prior to committing to permanency.

### Section 388 Hearing

On December 13, 2018, the court heard testimony and argument on mother's section 388 petition, which it denied. Mother's appeal from that denial was dismissed by this court for failure to file an opening brief.

The Department filed a second section 366.26 report on February 27, 2019, stating the minor's mental and emotional status had reportedly improved since being in a stable environment. Following an appointment with a therapist at behavioral health, it was determined that the minor was not in need of any behavioral health services. It was also reported that the minor had been very difficult to engage in conversation regarding adoption or future placement other than to state, " 'I want to go home.' " He reportedly became deflated when the topic of adoption was raised and he "went from a happy child, to sullen and hunched over" and would not respond to further questions about adoption. However, he also stated the adoptive parent took good care of him, fed him, and let him play outside and gave him "good choices." The minor enjoyed the animals at his adoptive family's home and was building a nurturing and loving relationship with his potential adoptive father, who he appeared to trust and to whom he gave affection and sought out for problem solving. The Department acknowledged the minor had an attachment to mother but noted he was also growing more attached to his potential adoptive parent.

The Department concluded neither parent had demonstrated an ability to provide the minor with a stable and permanent home environment and recommended the court terminate parental rights and identify adoption as the permanent plan.

### Contested Section 366.26 Hearing

At the section 366.26 hearing on March 14, 2019, the parties submitted on the evidence and oral argument. Mother argued the beneficial parental relationship exception

6

to adoption applied, noting her consistent visitation with the minor and the bond between mother and the minor. Mother also requested that the court consider legal guardianship rather than adoption as the permanent plan. The Department acknowledged the bond between mother and the minor but argued the minor had unique needs and struggled with instability, experienced a lot of trauma in mother's home prior to the Department's intervention, had previously been removed twice, and had a lot of behavioral issues in school. However, the symptoms and signs that the minor was struggling with instability were no longer present because of the support the minor received in his placement. The Department argued that while the minor was old enough to understand the impending adoption and to be sad about it, adoption was in the minor's long-term interest for stability and permanency. Minor's counsel acknowledged the bond between mother and the minor as well, but argued the bond was not so strong that terminating parental rights would be detrimental to the minor.

The court found the minor adoptable, terminated parental rights, and identified adoption as the permanent plan.

## DISCUSSION

Mother contends there was insufficient evidence to support the juvenile court's finding that the beneficial parental relationship exception to adoption did not apply.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any

7

circumstances which constitute an exception to termination of parental rights. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2); Evid. Code, § 500.)

Termination of parental rights may be detrimental to the minor when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception].)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) And even if there is such a bond, the parent must prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; accord *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1345 (*Jasmine D.*); *In re C.F.* (2011) 193 Cal.App.4th 549, 555.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, at p. 575.) On the other hand, " '[w]hen the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent[-]child relationship, the court should order adoption.' " (*Jasmine D.*, at p. 1350; *In re Autumn H.*, at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for

8

adoptive placement." (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53, quoting *Jasmine D.*, at p. 1348.)

"We must affirm a trial court's rejection of [the exception] if the ruling is supported by substantial evidence. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)

The existence of a beneficial relationship is determined by considering a number of factors, including the age of the child, the amount of time the child spent in the parent's custody, the positive or negative effect of interaction between the parent and the child, and the child's particular needs. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.) Here, it is undisputed that mother maintained consistent visitation with the minor throughout the dependency proceedings, and there was a positive emotional attachment between mother and the minor. However, that attachment is not enough to support application of the exception. A "parent must show more than frequent and loving contact or pleasant visits." (*In re C.F., supra*, 193 Cal.App.4th at p. 555.) Neither a loving relationship (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523, overruled on other grounds in *In re Zeth S.* (2003) 31 Cal. 4th 396) nor the derivation of some benefit from continued parental contact (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466) is enough to establish this exception. "Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854.) Consideration of the relevant factors in this case supports the juvenile court's findings.

Mother claims she and the minor "shared a mutual connection based on history and mutual love" and the "first critical and important bonding" between her and the minor occurred during the first two years of the minor's life prior to his initial removal. We are hard pressed to characterize the minor's time with mother during the first years of

9

his life and between detentions as having been a positive bonding experience. While it is true the minor was not removed until he was nearly three years old, his first removal in mid-2014 was due to mother's excessive drinking, use of marijuana, and domestic violence, behaviors that had clearly been developing over a long period of time prior to removal. Thereafter, the minor was returned to mother's custody in mid-2015 only to be removed a second time just two months later due mother's extreme intoxication. The minor was returned to mother in early-2016 under a plan of family maintenance and dependency jurisdiction terminated in February 2017. Just a year and a half later, the Department initiated the current dependency proceedings due, once again, to mother's abuse of alcohol and marijuana and domestic violence.

Each time the minor was removed, mother was provided reunification services in which she participated in varying degrees. However, each time the minor was returned to mother's care, he was subjected to the same behaviors—excessive drinking, marijuana use, and domestic violence—which not only left him without adequate care, protection, or supervision but also caused him to exhibit serious emotional and behavioral issues of his own.

Mother asserts she assumed a parental role during visits with the minor which was beneficial to the minor, and that the minor did not want the relationship to end, as evidenced by the fact that he repeatedly stated that he wanted to " 'go home' " and became deflated and sullen when the prospect of adoption was raised. The minor's sadness about the prospect of adoption was documented in the Department's section 366.26 report. However, the Department also reported the minor's mental and emotional status had greatly improved since being in the stable environment of his foster home, with no more violent or self-injurious behaviors once he was outside his mother's care. And while the minor expressed sadness and a desire to go home, he also expressed that he was well fed and well taken care of by his foster parent, he was allowed to play outside, and he enjoyed the animals at his adoptive family's home. While the minor had

10

an attachment to his mother, he separated from her without incident after visits. He was also developing a nurturing and loving relationship with and growing more attached to his foster parent, who he trusted and looked to for problem-solving and with whom he shared affection. He made cards for his foster parent stating, " 'I love you.' " The minor also reportedly built positive relationships with the other children in the foster parent's home, as well as the foster parent's extended family.

Finally, mother argues this case is similar to *In re Scott B.* (2010) 188 Cal.App.4th 452. There, the appellate court reversed an order terminating parental rights where the minor was 11 years old, autistic, and emotionally unstable, and failed to understand that adoption might mean the end of contact with his mother, to whom he had been closely bonded and with whom he had lived for almost his whole life. (*Id.* at pp. 471-472.) The court found that, given his strong emotional attachment to mother, his precarious emotional state, and his history of regressing or running away when stressed, the termination of parental rights entailed "a very good chance that he will have a meltdown if his usual frequent visitation with [m]other does not continue"—"the chance of a danger not worth taking." (*Id.* at p. 472.) The court found further that, on these extraordinary facts, "[t]ermination of parental rights is unnecessary given that a legal guardianship will provide Scott with stability in his life." (*Ibid.*, fn. omitted.) *In re Scott B.* is distinguishable.

While there are some similarities between *In re Scott B.* and this case, the facts and circumstances here diverge from those in *In re Scott B.* in a number of important respects. Unlike Scott, this minor had not lived with mother for almost his entire life. He was six years old when he was removed from mother in this case, but he had been removed twice before in the four years preceding commencement of this dependency action. The petition alleged the minor was exhibiting concerning behaviors consistent with emotional harm due to witnessing mother's alcohol abuse and domestic violence, but his mental and emotional status improved greatly within months of being placed with

11

a caregiver and he was neither autistic nor emotionally unstable. The minor expressed that he wanted to " 'go home' " and became "sullen and hunched over" when the issue of adoption was discussed, but he enjoyed his caregiver's home and family and was building a nurturing and loving relationship with his potential adoptive father, who he trusted, with whom he was affectionate, and from whom he sought advice. Unlike Scott, this minor was not in a precarious emotional state and had no history of regressing or running away when stressed, and there was no evidence presented that suggested the minor would be adversely affected by any interruption in his visitation with minor.

Mother disagrees, claiming the minor had an attachment to her such that the loss of ongoing contact would be detrimental to him. But even if some degree of detriment is implicit, there was no evidence the detriment was such that the minor "would be greatly harmed." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Thus, the legislative preference for adoption was not overcome. (*Ibid.*; see *In re Angel B., supra,* 97 Cal.App.4th at p. 466 ["A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent"].)

The record here supports the juvenile court's finding that the minor's relationship with mother did not rise to the type of substantial, positive emotional attachment that would cause the minor great harm if severed and did not outweigh the benefits of a stable and permanent home provided by adoption. The court's order is supported by substantial evidence.

## DISPOSITION

The juvenile court's order is affirmed.


                                         /s/\
                                         HOCH, J.


We concur:


/s/\
RAYE, P. J.


/s/\
RENNER, J.

13